## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ABC ACQUISITION COMPANY, LLC,

      Plaintiff,

      v.

AIP PRODUCTS CORPORATION, et al.,

      Defendants.

No. 18 CV 8420

Judge Manish S. Shah

After leaving Aetna Bearing Company, defendant James Trauscht founded defendant AIP Products Corporation and began competing with his former employer. He also hired defendant Donald Koziel, who at the time was working for the plaintiff in this case, ABC Acquisition Company LLC. ABC says that AIP, Trauscht, and Koziel misappropriated trade secrets, breached an employment agreement and their duties of loyalty, tortiously interfered with ABC's contracts and business expectancies, and engaged in a civil conspiracy, among other allegations. The parties filed cross-motions for summary judgment seeking to resolve most (but not all) of those allegations. ABC's motion for partial summary judgment is denied and AIP and Trauscht's motion is granted as to all claims against them. ABC's substantive claims against Koziel remain.

## I. Legal Standards

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must show that, after construing all of the facts and

drawing all reasonable inferences in favor of the non-moving party, *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014), no reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party is also entitled to summary judgment if the non-moving party both fails to "make a sufficient showing" on any essential element of its case and has the burden of proof for that element at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). These same rules apply equally to cross-motions for summary judgment, *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017), and evidence from one motion for summary judgment may be relied upon when deciding the other. *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019). Redundant, immaterial, impertinent, or scandalous matters may be struck. Fed. R. Civ. P. 12(f).

## II.  Facts

Aetna Bearing Company designs and manufactures bearings and related assemblies for agricultural, industrial, and automotive applications. [20] ¶ 1; [53-2] at 2.[1] It specializes in unique, made-to-order bearings. *Id.* For more than eighty years,

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. Citations to paragraphs include page numbers if the document cited contains multiple paragraphs that use the same paragraph number. The facts are largely taken from AIP and Trauscht's response to ABC's Local Rule 56.1(a)(3) statement, [77], Koziel's response to ABC's Local Rule 56.1(a)(3) statement, [79], ABC's combined response to AIP and Trauscht's ([77]) and Koziel's ([79]) Local Rule 56.1(b)(3)(C) statements, [95], ABC's response to AIP and Trauscht's Local Rule 56.1(a)(3) statement, [82]; *see also* [67] (Koziel joins and adopts as his own AIP and Trauscht's Local Rule 56.1(a)(3) statement), AIP and Trauscht's response to ABC's Local Rule 56.1(b)(3)(C) statement, [91], and Koziel's response to ABC's Local Rule 56.1(b)(3)(C) statement, [94], where both the asserted fact and the opposing party's response are set forth in one document. AIP and Trauscht filed seven documents under seal. [60]–[67]. Those documents were reviewed and relied upon while resolving the parties' disputes at summary judgment (even though none were cited in this opinion). Once filed with the court, documents

Aetna did not require its suppliers to promise confidentiality. [91] ¶ 1. By the time defendant James Trauscht joined the company,[2] thousands of Aetna's drawings were already in circulation among a myriad of suppliers. [59-2] 13:23–14:1, 34:21–35:1; [82] ¶ 3; [83-1] at 2; [91] ¶ 1. Trauscht took no action to change that policy, even after becoming president. [91] ¶ 1. During his tenure, Aetna continued to purchase parts from suppliers in China without requiring that they sign non-disclosure agreements and without otherwise placing any restrictions on the ways those suppliers used Aetna's drawings. [82] ¶¶ 16–19. Trauscht's presidency ended when he left to start his own bearing company (one of the other defendants in this case), AIP Products Corporation. [82] ¶¶ 3, 6, 12–13.

---

that affect the disposition of federal litigation are presumptively open to public view unless a statute, rule, or privilege justifies confidentiality. *City of Greenville, Ill. v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014) (citation and quotation omitted). If either party believes that any of the exhibits contain protected trade secrets (or other protected information), they shall file a statement within three weeks showing good cause for why the exhibits should remain under seal. That statement should identify any trade secrets by precise citation to the sealed documents (down to the line or word if necessary). If no such statement is filed, the documents shall be unsealed.

[2] ABC disputes whether Trauscht was initially employed by Aetna. [82] ¶ 3. It says he was initially hired by ABC Acquisition Company, an Illinois corporation, doing business as Aetna Bearing Company, *id.*, and that Trauscht was never an employee of the plaintiff in this lawsuit, ABC Acquisition Company, LLC d/b/a Aetna Bearing Company. [82] ¶¶ 3, 10; [91] at 14, ¶ 25. There is no dispute that Trauscht eventually served as president of the entity commonly referred to as Aetna in 2003, [82] ¶ 3, remained an employee of that entity more or less continuously through the end of 2014, *id.* ¶¶ 5–6, and was never an employee, president, or owner of the plaintiff in this case, ABC Acquisition Company, LLC d/b/a Aetna Bearing Company. [82] ¶ 10. Throughout this opinion, ABC refers to plaintiff ABC Acquisition Company, LLC d/b/a Aetna Bearing Company, and Aetna refers to the entity or entities that were doing business under the name Aetna Bearing Company (including Aetna Bearing Company, an Illinois corporation) before the asset purchase agreement that ABC and Aetna entered into in 2016. *See* [53-2].

One of Aetna's suppliers was Anfan Strategic Sourcing and Manufacturing Company. [82] ¶¶ 17, 20, 22. (Anfan is owned by Mike An. [82] ¶ 20.) Aetna sent Anfan manufacturing drawings for the parts it needed manufactured without ever placing any restrictions on Anfan's use or dissemination of those drawings. [82] ¶¶ 22–24, 40. Anfan also received copies of Aetna's drawings directly from Aetna's other suppliers. [82] ¶ 25.

Plaintiff ABC Acquisition Company purchased substantially all of Aetna's assets and now does business under Aetna's name. [53-2] at 2, 6 (§ 2.1), 20 (§ 4.12); [82] ¶¶ 7–8. The first sentence of the purchase agreement says that the agreement was made, "by and among ABC ACQUISITION COMPANY, LLC, a Michigan limited liability company ('Purchaser'), and AETNA BEARING COMPANY, an Illinois corporation ('Seller')." [53-2] at 2. The exact extent of the intellectual property that was sold pursuant to the asset purchase agreement is not clear because the schedule listing it is not a part of the record, but the agreement says that the missing schedule listed all of Aetna's intellectual property. [53-2] at 4 (§1.1), 20 (§ 4.12(A)). Aetna represented that it was in compliance with all laws applicable to that intellectual property, *id.*, and that to the extent the intellectual property constituted proprietary or confidential information, Aetna had adequately safeguarded such information from disclosure. [53-2] at 20 (§ 4.12(B)(xi)).

A few weeks after the asset purchase, Khalid Beidas took over as president of ABC. [82] ¶ 11. Under Beidas, ABC continued to conduct essentially the same business as Aetna, under Aetna's name. *Id*. ¶ 9. It also took steps to protect its

4

confidential information. It put all of its confidential information on a server, instructed its information systems team to install and maintain anti-virus systems, limited access to its confidential information to only those employees that needed it, and prohibited new suppliers from disclosing Aetna's confidential information. [77] ¶ 13.

Beidas immediately made sure that ABC was entering into non-disclosure agreements with new suppliers, but it took a few years before he and ABC went back and put in place non-disclosure agreements with existing foreign suppliers. [82] ¶ 19. The reason for Beidas's delay was that he assumed non-disclosure agreements were already in place. [95] ¶ 6; [53-4] 57:19–59:12. He based his assumption on Aetna's representation that it had adequately safeguarded its proprietary and confidential information. *Id.* As a result, ABC continued to use Anfan (and other suppliers) without any non-disclosure agreement in place. [82] ¶¶ 22–23, 26, 29–30; [95] ¶¶ 4–5. For the first year or so of Beidas's presidency, ABC also continued to send out drawings that were not marked as either confidential or proprietary. [82] ¶ 34. Near the end of 2016, ABC sent Anfan pricing information and drawings for part number AG5710 (which was used by one of Aetna's customers, Calmer Corn Heads) without first putting in place any non-compete or non-disclosure agreement. [82] ¶¶ 23, 41.

ABC also did not put in place written policies regarding how to treat its own trade secrets or confidential information, [82] ¶ 33, and did not place its drawings in locked drawers or cabinets (meaning that the only lock that protected those drawings was the lock that secured their whole facility). [82] ¶¶ 35–36. There was also a shared

laptop in ABC's engineering room that was linked to a server that contained ABC's drawings. [82] ¶ 37. The password for it was written on a sticky note affixed to the keyboard. [82] ¶ 38.

Shortly after Trauscht left Aetna and founded AIP, ABC and AIP started competing for customers. [82] ¶ 15. Trauscht emailed Calmer and told them he had sold Aetna and started a new company and that his new company could save Calmer money. [77] ¶ 16; [53-6]. A few months later, Trauscht and An started exchanging texts declaring that they needed to destroy ABC. [77] ¶ 17; [53-7] at 3 (Trauscht and An refer to the entity they are trying to destroy as "Aetna," but the context and timing of those texts indicate they are talking about the plaintiff in this case, ABC, which was still doing business under the name Aetna). In one series of texts, Trauscht requested that An remove a label that suggested one of the drawings had come from Aetna. [77] ¶ 18; [53-8] at 18–19 ([Trauscht to An]: "Take out AES 1000. I have no idea why CCH [Calmer Corn Heads] sent the AIP5710 print to Aetna. I will maintain that we created some parts from a step files, other from hardware CCH provided. I will deny I took the print from Aetna, which I did not"); [53-20] (some of AIP's drawings noted, "[m]ust comply with current version of AES 1000 general purchasing requirements"). Immediately beforehand, Trauscht had written that he and An were free to remove the label because Trauscht never signed a non-compete and An never signed a non-disclosure agreement. [53-8] at 19.

Within a few years of its purchase of Aetna's assets, ABC terminated its relationship with Anfan. [82] ¶ 26. Anfan now supplies parts to AIP. *Id*. ¶ 27. As part

of that new relationship, Anfan sent AIP and Trauscht the sales assembly drawings for part number AG5710, *id*. ¶¶ 43–44, and worked directly with Calmer to adapt and revise those drawings. *Id*. ¶¶ 45–46. Trauscht received the AG5710 drawings from Anfan—not ABC or Aetna. *Id*. ¶¶ 42, 47, 77.

Shortly after the asset purchase, ABC and the final defendant, Donald Koziel, entered into an employment agreement. [77] ¶ 7; [53-3] at 2. *See also* [53-2] at 5 (§ 1.1). That agreement prohibited Koziel from divulging, communicating, or using "to the detriment of [ABC] or for the benefit of any other Person" any of ABC's "Confidential Information or Trade Secrets." [53-3] at 7 (§ 6.3). *See also* [53-3] at 9 (§ 6.6) ("Person" includes individuals, corporations, limited liability companies, and other entities). Confidential information is any confidential data or information that relates to ABC's business and that does not "rise to the status" of a trade secret under law, so long as that information was disclosed through the employment relationship, had value to ABC, and was not generally known to either ABC's or Aetna's competitors. [53-3] at 8 (§ 6.6). It includes (among other kinds of information) "internal business information" (such as that "relating to … cost, rate and pricing structures and accounting and business methods"), the "identities of [and] specific contractual arrangements with … the suppliers, distributors, [and] customers" of ABC, "trade secrets, know-how, compilations of data and analyses, techniques, … documentation, [and] data … relating thereto," and "methods, designs, analyses, drawings, reports and all similar or related information." *Id*. Trade secrets are defined to mean information belonging to ABC or Aetna which derives economic

7

value, actual or potential, from not being generally known to (or readily ascertainable by proper means by) anyone else who is able to obtain economic value from the disclosure or use of that information, and that is the "subject of efforts that are reasonable under the circumstances to maintain its secrecy." [53-3] at 9 (§ 6.6). Koziel agreed to receive that information in confidence and as a fiduciary, to hold it in strict confidence, to take no action causing the information to lose its protected character, and to not disclose that information to any third parties without ABC's written consent. [53-3] at 7 (§ 6.3).

Koziel did not stay on with ABC much past the asset purchase. *See* [82] ¶ 49; [77] ¶ 19. Trauscht had been the one to hire Koziel at Aetna, [82] ¶ 48, and before Koziel's departure from ABC,[3] Trauscht and Koziel had a phone call in which they discussed a potential opportunity for Koziel at a different company (Line Craft) and a meeting at a bar during which Trauscht told Koziel that if his employment at ABC ended and Koziel had nothing lined up he should call Trauscht. [82] ¶¶ 55–57; [53-10] at 3; [77] ¶¶ 20–21; [95] ¶ 24. Trauscht and An texted about Koziel's departure, too. [53-8] at 14–15.

Before he was hired by AIP, Koziel told Trauscht that Koziel either had no written agreement with ABC or that, if he did, that agreement had expired. [59-2] 77:18–78:12; 88:13–19; [82] ¶¶ 51–52. Trauscht never saw a copy of Koziel's

---

[3] Both parties' assertions in their statements of fact say that these calls occurred before Koziel's departure from Aetna. [82] ¶ 56. The parties sometimes blur the distinction between Aetna and its purchaser ABC, and I assume the departure referenced in ¶ 56 is the same departure referenced in ¶ 55: Koziel's September 2018 departure from what was by then ABC. [82] ¶ 55.

employment agreement before deciding to hire him. *See* [82] ¶ 53; [59-2] 89:8–90:24.[4] The only way Trauscht could have known about Koziel's employment agreement was by virtue of the fact that he was a part owner of Aetna when its assets were sold to ABC. [82] ¶ 61. Trauscht was not a part of the negotiations when ABC bought Aetna and the person who conducted those negotiations had only one conversation with Trauscht, during which employment agreements (and whether ABC would require them) were not discussed. [82] ¶¶ 62–63.

Trauscht eventually offered Koziel a job at AIP. [77] ¶ 21. Before leaving ABC, Koziel transferred files from his work computer to a USB drive. [82] ¶ 54. Among the files he downloaded were examples of projects that he had worked on while at Aetna, including the manufacturing drawings for Aetna bearing part number A0046 (which was used by Aetna customer Dynex). [53-9] 41:2–17; 45:8–46:21. (Beidas says that ABC designed that part, [1] ¶ 56, but one of Aetna's project engineers says Dynex

---

[4] At his deposition, Trauscht was asked whether he had seen Koziel's employment agreement before the filing of this lawsuit. [59-2] 88:10–11. He said he did not think so. *Id.* 88:12. He was then asked whether Koziel ever told him about the agreement. *Id.* 88:13–15. Trauscht said he first learned of the agreement after Koziel left Aetna, when Koziel told him that the agreement had expired, was not renewed, and that Koziel was an at-will employee. *Id.* 88:16–20. A moment later, Trauscht sought to reiterate that, although he eventually became aware of the agreement's existence, he did not see the agreement before the filing of this lawsuit. *Id.* 89:8–15. He was then asked whether he had seen or become aware of the agreement after the filing of the lawsuit, *id.* 89:18–20, and again, he said, "I don't think so." *Id.* 89:21. Then he said, "No, I did see it. I did not see it." *Id.* 90:2. When Trauscht's lawyer repeated the question to him, Trauscht said, "I don't think so because I never knew … he was making $82,392. Yeah, this is news to me. Yes, never saw it." *Id.* 90:7–11. That momentary equivocation does not create a genuine dispute as to what Trauscht knew about Koziel's employment agreement at the time Trauscht hired him. At most, it casts some doubt on Trauscht's conclusion that he had still not seen the agreement at the time he was deposed. That conclusion is not material. *See also* [53-5] ¶ 16 (Trauscht's declaration is consistent with his testimony: Koziel told him that he was "not bound by any agreement with Aetna that would prevent him from working for AIP").

supplied the print for that part. [95] ¶ 19; [59-4] 35:21–36:12.) Beidas says that Koziel then "wiped clean" his company laptop (i.e., "took his trash folder and deleted all the files in the trash folder," [59-3] 212:14–213:4) before returning it to Aetna. [1] ¶ 50. Koziel says he did no such thing. [80-1] ¶ 2.

Koziel never told Trauscht that he had taken information from ABC. [82] ¶ 58. Koziel says that he never used the information he downloaded to compete with ABC. [80-1] ¶ 6. A forensic examination of Koziel's USB drive revealed that Koziel never transferred the files from his USB to any other USB and that Koziel opened documents on the USB drive on only ten occasions. [82] ¶ 59; [95] at 35, ¶¶ 17–18; [80-2] at 13–15. On three of those occasions, he opened his resume, [95] at 35, ¶ 18; and of the other seven, six pertained to documents involving one of Aetna's former customers, Polaris. [95] ¶ 19; [80-2] at 15–17. The last of the files was an Excel spreadsheet used to measure rates and efficiencies between operators on assembly lines. [95] at 38, ¶ 23.

ABC says that four of those documents are proprietary: a PowerPoint presentation, an Excel file, the file, "Polaris DG 6205-TR48," and the efficiency graph. [95] at 37, ¶¶ 19–22. Beidas says that DG 6205-TR48 was "one revision below the patented technology that [ABC] submitted the patent for," and that he knows the drawing because he is the one who invented it. [53-4] at 231:19–232:2. He said that he was not sure whether the company had paid someone else to create the efficiency

graph (and so claimed it was proprietary), *id.* at 232:4–19, and that he had created the PowerPoint presentation with the help of programmers. [53-4] at 232:13–19.[5]

Koziel says the PowerPoint presentation came from Polaris and had to do with the supplier approval process that Polaris used to allow companies like Aetna to become approved suppliers, [80-1] ¶ 14, that the efficiency graph was a blank Excel file, *id.* ¶ 15, and that none of the files contain confidential or proprietary information. [80-1] ¶ 16. The USB drive was never inserted into the laptop that Trauscht uses for AIP business. [82] ¶ 60.

Koziel says that he was never aware of what price Aetna charged for its products. [53-9] 46:22–24. In an email to Trauscht shortly after he started working at AIP, Koziel wrote: "Some A0022 info. Aetna quoted the whole eau of 6000. Price 13.92 or so. Aetna Franklin Park cost around 14.00 hence loosing [sic] money." [53-19] at 2. In another email sent after he started working at AIP, Koziel wrote to someone at Dynex and said, "I took part in the initial meeting with Joe Galvin and Jonathan Haedt regarding Dynex part number 371.900 (Aetna A0046, you will also see my name on the original quote dated November of 2014)." [53-11] at 2. *See also* [53-12] (when Harry Haedt found out about that email, he forwarded it to Mike An

---

[5] When looking at an exhibit that was presented to him during his deposition (the exhibits to Beidas's deposition were not attached to the transcript, so it is difficult to know what document he was looking at, but the questioner described it as "the report produced by QDiscovery in regard to the review of the USB of Koziel as well as his wife's computer," which corresponds to the summary analysis report from QDiscovery that was attached as an exhibit to Koziel's Local Rule 56.1(b)(3)(C) statement, [80-2]), Beidas suggested that the Excel spreadsheet and the efficiency graph might be one and the same. [53-4] at 232:13–17 (Q: "In No. 8 do you recognize these two documents that show that were opened up by Excel and PowerPoint? [A:] I guess the one's the efficiency graph, right?").

and expressed displeasure with AIP's approach. An then forwarded the chain to Trauscht, writing, "Shit Dynex told HH"). In one of their text exchanges, Trauscht told An that "Don" (presumably, Koziel) was sure of the price Aetna charged on a certain item and that, as a result, he and An should maintain their current price offering. [53-8] at 7.

Koziel started out on a commission basis as Regional Sales Manager for AIP and had business cards and an email address. [77] ¶ 25; [82] ¶¶ 49, 65. He solicited quotes from Aetna's customers (including Dynex), [77] ¶¶ 26–27; [53-10] at 3; [53-11] at 2, but he never made any sales and was never paid any money by AIP. [82] ¶ 66. While Koziel was at AIP, he never spoke to Trauscht (or anyone else) about Calmer Corn Heads. [95] ¶ 11. AIP terminated his employment shortly after the filing of this suit. [82] ¶ 66.

The only manufacturing drawings that ABC can identify that Trauscht purportedly took are the Calmer drawings. [82] ¶ 71. The only ABC customers that have ever placed orders with AIP are Calmer and Shoup. *Id.* ¶ 68. From 2014 to 2018, ABC did an average of more than $160,000 in business with Calmer. [53-17] at 5. In 2019, ABC's sales to Calmer fell to $7,491. *Id.* ABC's business with Shoup fell from an average of $100,000 during 2014 to 2018 to $17,084 in 2019. [53-17] at 5. AIP, on the other hand, earned $300,000 from Calmer in 2019 and $50,000 from Shoup. [77] ¶ 38; [53-14] 118:24–120:8.

In 2019, ABC earned more money selling part numbers A0046 than it had in previous years. [53-17] at 5. It earned about $20,000 less than average selling part

number A0022. *Id*. Sales for part number AG5710 fell from an average of just shy of $125,000 per year to $0. *Id*.

## III. Analysis

ABC brings seven claims. Count I alleges that AIP, Koziel, and Trauscht violated the Defend Trade Secrets Act, [1] ¶¶ 59–68, and Count II alleges that they violated the Illinois Trade Secrets Act. *Id*. ¶¶ 69–78. Count III alleges that Koziel violated the Computer Fraud and Abuse Act, *id*. ¶¶ 79–83, and Count IV alleges that he breached his employment agreement. *Id*. ¶¶ 84–87. Count V alleges that Koziel and Trauscht breached their duty of loyalty, *id*. ¶¶ 88–93, Count VI alleges that AIP and Trauscht tortiously interfered with Koziel's confidentiality agreement, *id*. ¶¶ 94–99, and Count VII alleges that Koziel and Trauscht engaged in a civil conspiracy. *Id*. ¶¶ 100–106. Koziel's counterclaim was dismissed, [48], and neither AIP nor Trauscht have advanced any counterclaims. [20].

ABC moves for partial summary judgment on Counts II, IV, and VI. [52]. AIP and Trauscht move for summary judgment on all counts against them (i.e., all of the counts except Counts III and IV). [55]. Koziel adopts AIP and Trauscht's motion for summary judgment as to Count VII, [67], and opposes ABC's motion for summary judgment on counts II and IV. [78]. Koziel advances no motion for summary judgment of his own, which means Count III and ABC's claim against Koziel for violations of the Defend Trade Secrets Act are not at issue here.

ABC has asserted claims under the Defend Trade Secrets Act and the Computer Fraud and Abuse Act, both of which are federal laws. 18 U.S.C.

13

§ 1836(b)(1); 18 U.S.C. § 1030(g). I have jurisdiction to hear those claims under 28 U.S.C. § 1331, and jurisdiction over the state-law claims (which form part of the same case or controversy) under 28 U.S.C. § 1367(a). I also have jurisdiction under 28 U.S.C. § 1332 because there is more than $75,000 at issue and because the parties appear[6] to be diverse: ABC says it is a Michigan corporation, [20] ¶ 17, AIP is an Illinois corporation with its principal place of business in Illinois, [20] ¶ 18, and both Trauscht and Koziel are citizens of Illinois. [20] ¶¶ 19–20; 28 U.S.C. § 1332.

## A.      Motions to Strike and for Sanctions

Whenever a party moves for summary judgment in the Northern District of Illinois, it must submit a memorandum of law, a short statement of undisputed material facts, and copies of documents (and other materials) that demonstrate the existence of those facts. N.D. Ill. Local R. 56.1. The memorandum cites to the separate statement of facts, *Mervyn v. Nelson Westerberg, Inc.*, 142 F.Supp.3d 663, 664–65 (N.D. Ill. 2015), and the separate statement of facts cites to specific pages or paragraphs of the documents and materials in the record. *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004). The non-moving party counters with a

---

[6] The complaint (and ABC's answer to it) says that ABC is a Michigan corporation with its principal place of business in Michigan. [1] ¶ 17; [20] ¶ 17. But the complaint was filed on behalf of "ABC Acquisition Company, *LLC*, d/b/a Aetna Bearing Company," *see* [1] at 1 (emphasis added), and the asset purchase agreement was entered into by "ABC Acquisition Company, LLC, a Michigan limited liability company." [53-2] at 2. A corporation is a citizen of both the state in which it is organized and the state where it has its principal place of business, but limited liability corporations are citizens of every state of which any member is a citizen. *Belleville Catering Co. v. Champaign Mkt. Place, L.L.C.*, 350 F.3d 691, 692 (7th Cir. 2003). If ABC is a limited liability corporation and if any one of its members is a citizen of Illinois, the parties would not be diverse. *Id.* Nonetheless, there would still be supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

response to the separate statement of facts that goes paragraph-by-paragraph and either admits each fact or points to a specific page or paragraph in the record that shows there is a dispute. N.D. Ill. Local R. 56.1(b). Legal arguments do not go in the separate statements of fact. *See, e.g.*, *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("[i]t is inappropriate to make legal arguments in a Rule 56.1 statement of facts"); *Rivera v. Guevara*, 319 F.Supp.3d 1004, 1017–18 (N.D. Ill. 2018). Cites to the record do not go in the memoranda, *see Mervyn*, 142 F.Supp.3d at 664–65, and cites to entire documents or depositions (rather than specific pages) are stricken at the court's discretion. *Ammons*, 368 F.3d at 818.

The parties' responses to each other's separate statements of fact should either cite to specific pages in the record that demonstrate a dispute or concede that the fact is undisputed. Each might disagree wholeheartedly with something the other side said, but unless they can point to a page in the record that suggests it is not true, they are out of luck. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material").

The second paragraph of ABC's statement of material facts says that ABC was formed for the purpose of acquiring Aetna's assets on the same day that the asset purchase agreement was completed. [54] ¶ 2. ABC cites to "Exhibit A, Asset Purchase Agreement (redacted) – AIP 00056." [54] ¶ 2. That document has no page numbers (or at least, none that correspond to "AIP 00056"), *see* [53-2], so there is no way to

confirm whether anything in that document supports ABC's statement without combing through each of its forty-five pages. *See* [53-2].

AIP and Trauscht's response to that paragraph argues that ABC never produced that version of the asset purchase agreement during discovery and so should be precluded from relying on it now. [77] at 3. That legal argument does not cite to specific pages in the record (e.g., a page of a document showing that someone issued a discovery request requiring the production of a non-redacted copy of the asset purchase agreement). *See* [77] at 2–3.

The remaining paragraphs of both parties' statements of fact (and their responses thereto) are full of similar violations of the local rules. District courts can demand strict compliance, *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 787 (7th Cir. 2019); *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014), but they cannot play favorites. *Novak v. Bd. of Trustees of S. Illinois Univ.*, 777 F.3d 966, 974 n.9 (7th Cir. 2015). Neither party complied with the local rules. AIP and Trauscht's motion to strike certain paragraphs of ABC's separate statement of facts, [73], is granted in part.[7] So, too, is Koziel's effort. [78] at 2–4. Those portions of AIP and Trauscht's and Koziel's filings that do not comply with the local rules have been stricken and disregarded as well. *See Novak*, 777 F.3d at 974 n.9.

Every time any one of the parties failed to properly controvert an asserted fact, that asserted fact has been deemed admitted. N.D. Ill. Local R. 56.1(b)(3)(C). *See, e.g.*,

---

[7] AIP and Trauscht's motion to strike raises one issue that is not addressed in their motion for summary judgment and that bears on the merits of ABC's claims: whether Trauscht was a "seller" under the asset purchase agreement. [73] at 5. That argument is addressed below.

[95] at 33, ¶ 13 (citing to "Exhibit 18 of Koziel's Deposition" and "PSMF Ex. R at p.2," but where the version of Koziel's deposition that was filed on the record does not contain exhibits, *see* [53-9], and where Exhibit R to ABC's statement of material facts does not contain the quoted language. *See* [53-19] at 2). Every time that a party submitted new factual material in support of their reply briefing, the exhibits submitted were disregarded. *See* [90-1]; [90-2]; [93-1]; [93-2]; *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009); *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 968 (7th Cir. 2020).

Where the parties relied on evidence that would not be admissible at trial (and where at least one party raised an objection in their briefing as to that evidence), that evidence has been disregarded. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). The most common example of this was ABC's repeated reliance on the allegations in its complaint. Beidas signed an affidavit attached to the complaint and swore under penalty of perjury that everything in it was true, [1] at 20, so the complaint is the functional equivalent of a declaration admissible under Federal Rule of Civil Procedure 56(c). *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017); *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994) ("[t]he evidence need not be in admissible *form* … [b]ut it must be admissible in *content*"). Even though relying on verified pleadings to avoid summary judgment undermines the function of Rule 56, there is no strict prohibition against it so long as the verification is made under penalty of perjury and satisfies all the other criteria set out in Rule 56. *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020).

17

Beidas could take the stand at trial and repeat some of what he has alleged in the complaint. But Beidas could not testify to things he did not personally perceive, and he did not personally perceive a lot of what is in the complaint. *See, e.g.* [1] ¶¶ 52–54; [77] ¶ 24; Fed. R. Evid. 602; *Bridges v. Dart*, 950 F.3d 476, 480 n.4 (7th Cir. 2020); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989). Perhaps if Beidas had included some context suggesting he personally knows (for instance) what Koziel did after leaving ABC (or if ABC had indicated in its briefing that it had an alternative, admissible source from which those same facts might be properly established at trial), then ABC's reliance on the complaint might not have been a problem. *Eisenstadt*, 113 F.3d at 742. But as it is, ABC has relied exclusively on the statements Beidas made in the complaint to establish certain actions that Koziel took after leaving ABC and has not sufficiently established that Beidas perceived those actions with his own senses. *See, e.g.*, [1] ¶¶ 51–56; [54] ¶ 28. That testimony—whether it is in the complaint or Beidas's deposition—has been disregarded.

Interrogatory answers are also fair game during summary judgment briefing so long as they have been verified. Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record, including … interrogatory answers, or other materials"); *Lewis v. McLean*, 864 F.3d 556, 561 (7th Cir. 2017). Koziel verified the interrogatory answers that ABC relies upon here, [53-10] at 5, and had personal knowledge of the information he attested to therein. *See id*. Nobody swore under penalty of perjury to the truth of ABC's answers to AIP's third set of interrogatories.

*See* [53-17] at 8. Those answers have been stricken and disregarded. *See* Fed. R. Civ. P. 56(e); 28 U.S.C. § 1746; *Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991); *Schertz v. Waupaca Cty.*, 875 F.2d 578, 582 (7th Cir. 1989).

AIP and Trauscht request attorney's fees because ABC's motion implies that Trauscht used to be president and part-owner of ABC when, in fact, he was president and part owner of Aetna Bearing Company, a predecessor to ABC. *See* [53-2] at 2; [76] at 4–5. AIP and Trauscht say ABC should have known that statement was untrue (and that ABC's failure to correct the statement amounts to a falsehood) because AIP and Trauscht's amended answer denied that Trauscht was ever president of ABC. [37] ¶ 2.

If an affidavit or declaration is submitted in support of a motion for summary judgment in bad faith, the submitting party may be ordered to pay the fees incurred as a result of that affidavit or declaration (so long as they have notice and a reasonable time to respond). Fed. R. Civ. P. 56(h). The statement that AIP and Trauscht have drawn attention to comes from the introduction to ABC's memorandum in support of its motion for partial summary judgment, [53] at 1, not an affidavit or declaration. AIP and Trauscht have not spelled out what motive ABC might have to lie about which entity Trauscht ran, and given that ABC continued to sell parts under Aetna's name after acquiring the company, I infer that it was an oversight and not a lie. AIP and Trauscht did not keep ABC and Aetna perfectly straight in their statements of fact, *see, e.g.* [58] ¶ 56, or during Trauscht's deposition, *see* [59-2] at 71:9–23 (Koziel did not leave Aetna, he left ABC), either. Nor have AIP

19

and Trauscht identified any prejudice they suffered as a result of the mistake. Koziel's dramatic plea that he should get attorney's fees because Beidas referred to a desktop as a laptop is even less compelling: there is no indication that those statements resulted from anything other than innocent confusion. [78] at 3. Those mistakes were far too trivial to justify sanctions. AIP and Trauscht's request for attorney's fees, [76] at 4–5, is denied. So is Koziel's. [78] at 3.

### B.    Counts I and II: Misappropriation of Trade Secrets

The Defend Trade Secrets Act creates a private right of action for anyone whose trade secrets have been misappropriated. 18 U.S.C. § 1836(b)(1). In order to qualify as a trade secret, the secret must consist of certain kinds of information (including financial, business, technical, economic, and engineering information, in the form of patterns, plans, designs, techniques, processes, or procedures), the owner must have taken reasonable measures to keep that information secret, and the information must derive independent economic value from the fact that it was kept secret from someone who might have obtained economic value from its disclosure or use. 18 U.S.C. § 1839(3). A trade secret is misappropriated if it is acquired by improper means, and improper means include misrepresentation and breach (or inducement of breach) of any duty to maintain the information's secrecy. 18 U.S.C. § 1839(5)(a)–(b), 1839(6). Misappropriation also includes any disclosure that occurs under circumstances that gave rise to a duty to maintain secrecy. *Id*. § 1839(5)(B)(ii).

Illinois, too, provides a private right of action for trade secret misappropriation. *See* 765 Ill. Comp. Stat. Ann. 1065/4. The Illinois Trade Secrets Act's definitions do not differ from those in the Defend Trade Secrets Act in any way material to the

parties' dispute. *See* 765 Ill. Comp. Stat. Ann. 1065/2. ABC has to establish that the information was "(i) secret (that is, not generally known in the industry), (ii) misappropriated (that is, stolen … rather than developed independently or obtained from a third source), and (iii) used in the defendants' business." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265–66 (7th Cir. 1992).

The first question is whether ABC has identified any trade secrets at all. ABC cannot "just identify a kind of technology" and then ask the court to pore over its filings in search of secrets that fit the statute's description. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002); *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets."); *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, No. 19-1104, 2020 WL 4187246, at *5 (1st Cir. July 21, 2020) (any trade secrets "were not identifiable because TLS did not separate the purported trade secrets from the other information that was known to the trade") (cleaned up); *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 491 F.3d 350, 354 (8th Cir. 2007) ("[s]imply to assert a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status"); *GlobalTap,* 2015 WL 94235, at *6 ("[t]he court cannot analyze whether a piece of information was sufficiently secret to derive economic value or whether [the plaintiff] took reasonable

efforts to keep information secret without first knowing, with particularity, what information comprises the secret.")

Even after Koziel pointed out that ABC had failed to identify any specific trade secrets in his motion for partial summary judgment, [78] at 9, ABC never managed to specifically identify and label a single trade secret. It included the definitions of the terms "confidential information" and "trade secrets" in Koziel's employment agreement, *see* [93] at 14–15, quoted extensively from an email from Koziel to Trauscht that includes a detailed explanation an eleven-step manufacturing process that Aetna used to produce one of its bearings, [93] at 12, and attached to its briefing various drawings, [53-20], hundreds of text messages, *see, e.g.* [83-3], and dozens of emails replete with industry jargon. *See, e.g.*, [83-6]. But it never came out and said anything close to, "this one is a trade secret." The closest it comes to identifying a specific piece of information that it believes constitutes a trade secret is when referencing things like "Aetna's confidential and proprietary Trade Secrets, including its drawings and price information that were provided by Defendants to Mike An," [81] at 6, or ABC's "drawings and prints." *See* [81] at 12. That is not enough. Nowhere does ABC clearly identify a specific drawing, print, or piece of pricing information in particular, or even include all of the information that would be necessary to determine whether a particular piece of information falls under the definition of a trade secret. For example, ABC offers no evidence to demonstrate whether the eleven-step manufacturing process derives economic value from the fact that it is not generally known. 18 U.S.C. § 1839(3); 765 Ill. Comp. Stat. Ann. 1065/2. That makes it

22

exceedingly difficult to know whether AIP, Trauscht, and Koziel violated either the Defend Trade Secrets Act or Illinois's Trade Secrets Act. And since ABC bears the burden of establishing each of the elements of these claims at trial, that difficulty inures to the benefit of AIP, Trauscht, and Koziel. *See IDX Sys. Corp.,* 285 F.3d at 584; *Composite Marine Propellers, Inc.,* 962 F.2d at 1266; *Celotex Corp.*, 477 U.S. at 323.

ABC's trade secrets claims against Trauscht suffer from another deficiency: Trauscht did not obtain the drawings in question improperly. The only specific manufacturing drawings that ABC can identify that Trauscht misappropriated are the Calmer Corn Head drawings, [82] ¶ 71, and the only specific Calmer Corn Head drawing that ABC mentions in its briefing is the one titled, "AG5710." *See* [53] at 10. Trauscht did not take this drawing from ABC. Aetna willingly sent that drawing to Anfan without any restrictions in place, [82] ¶ 41, and then Anfan forwarded those drawings to AIP and Trauscht. [82] ¶ 42.

Nothing about how Trauscht obtained those drawings violated the asset purchase agreement. That agreement was between ABC Acquisition Company and Aetna Bearing Company. [53-2] at 2.[8] Presidents are not usually personally liable for

---

[8] I treat this agreement as though it is governed by Illinois law. Neither ABC, AIP, Trauscht, or Koziel raised the choice-of-law issue as it pertained to the asset purchase agreement, and so I apply the law of the forum state, Illinois. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). In any event, Michigan's contract law is in accord. *See, e.g. Innovation Ventures, L.L.C. v. Liquid Mfg., L.L.C.,* No. 315519, 2014 WL 5408963, at *6 (Mich. Ct. App. Oct. 23, 2014) ("we find that defendant Paisley cannot be personally liable under the Termination Agreement because, although he signed the agreement, he did so in his capacity as a corporate officer, and not as an individual. A corporate officer generally is not liable for the obligations of the corporation"); *McLaughlin v. Rourke*, No. 195897, 1998 WL 1986988, at *6 (Mich. Ct. App. Dec. 29, 1998) ("Generally, shareholders, directors and

the contracts entered into by the corporations they lead, *Cent. Illinois Pub. Serv. Co. v. Molinarolo*, 223 Ill.App.3d 471, 475 (5th Dist. 1992), at least not when they sign in their representative capacity. *Knightsbridge Realty Partners, Ltd.-75 v. Pace*, 101 Ill.App.3d 49, 53 (1st Dist. 1981). The asset purchase agreement was not only signed by the president of Aetna in a representative capacity, it was not signed by Trauscht. [53-2] at 44. Shareholders are not generally liable for the obligations of the corporation, either, *Beatrice Foods Co. v. Illinois Ins. Guar. Fund*, 122 Ill.App.3d 172, 174 (1st Dist. 1984) ("[t]he shareholders of a corporation … will not ordinarily be held liable for the debt and obligations of the corporation"), and ABC has presented no evidence or argument going to the factors that might justify the application of an exception to that rule.

ABC has not shown that the asset purchase agreement was breached at all. When Aetna agreed to sell its assets to ABC, it promised that, "to the extent any of [its] Intellectual Property constitutes proprietary or confidential information," it had "adequately safeguarded such information from disclosure." [53-2] at 21 (§ 4.12(B)(xi)). But long before entering into that agreement, Aetna (at times under the direction of Trauscht) had widely circulated thousands of their manufacturing drawings to many, many suppliers. [82] ¶ 18. The obvious inference is that neither Aetna nor Trauscht thought those drawings were confidential or proprietary to begin with, and nothing in the record allows any other reasonable inference. The suggestion

---

officers of a corporation cannot be held personally liable for the corporation's acts or debts, unless unusual circumstances justify disregarding the corporate entity").

that Trauscht was laying the groundwork to (years later) defect, start his own company, and then circle back with Anfan to obtain back-door access to Aetna's confidential and proprietary information is unsupported by evidence and undermined by the fact that Trauscht apparently sent the drawings to many different suppliers. If he had wanted to misappropriate secret drawings, he would not have started by sending them to a long list of suppliers, causing them to lose the very value he hoped to later make use of. No reasonable jury could believe it. ABC's theory that Trauscht intentionally neglected to obtain NDAs so that he could later trick ABC into relying on Aetna's representations in the asset purchase agreement to get Aetna to send Anfan a copy of AG5710 without first requiring that an NDA be put in place has no support in the record. It is conjecture and cannot support ABC's claim against AIP and Trauscht.

Once a trade secret is public knowledge, it is no longer a trade secret. *BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 706 (7th Cir. 2006). ABC's explanation for its initial failure to obtain NDAs is that it assumed NDAs were already in place because Aetna had promised that it had taken reasonable efforts maintain the secrecy of all of its confidential and proprietary information. *See* [53-2] at 21 (§ 4.12(B)(xi)). Fair enough. But that argument does nothing to address whether AG5710 qualified as a trade secret in the first place. Aetna's promise was only made "to the extent any of the Intellectual Property constitutes proprietary or confidential information." *See id.* The only evidence in the record is that many of Aetna's drawings had been widely distributed by the time it signed the asset purchase agreement. [82]

25

¶ 18. Trauscht says there were thousands in circulation before he started. [59-2] at 34:21–35:1. ABC sent Anfan a copy of AG5710 without first putting any restrictions on its use (and without marking it as confidential, [82] ¶ 45) and admits that it is at least possible that AG5710 had been so widely distributed that Anfan also would have been able to obtain a copy from someone outside of Aetna's ranks. [82] ¶ 40. Nothing Aetna promised in the asset purchase agreement could have made them secret again. Absent some indication AG5710 was an exception to Aetna's longstanding policy of disseminating its drawings, the only reasonable inference is that it was not a secret to begin with. ABC has cited to nothing in the record that would support a contrary inference.

The laundry list of efforts ABC took to maintain the secrecy of its confidential data after Aetna's drawings had been made public (the confidentiality agreements it put in place, the protected servers it created, the locks it placed on its facilities, etc., *see* [81] at 8–9) are neither here nor there. Whether reasonable measures were taken is ordinarily a question of fact, *Tax Track Sys. Corp. v. New Investor World,* Inc., 478 F.3d 783, 787 (7th Cir. 2007), but as a matter of law, something is not turned back into a secret just because a few copies of it are suddenly difficult to access. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished"); *BondPro Corp.*, 463 F.3d at 706.

26

In its reply in support of its motion for summary judgment, ABC raises a theory that appears nowhere else in its briefing: Trauscht knew that Koziel was relying on confidential information while working for AIP, and either hired Koziel for the purpose of obtaining ABC's trade secrets or ratified Koziel's independent decision to steal ABC's trade secrets by doing nothing to stop Koziel's use of those trade secrets once Koziel was working with AIP. *See* [93] at 9–12. In support, ABC cites to emails Koziel sent which display impressive recall of Aetna's pricing information (to the penny, [53-19] at 2) and manufacturing processes. *See* [53-19] at 3. Those emails support the inference that Koziel either remembered all eleven steps to Aetna's A0022 Belvac bearing manufacturing process (including the fact that step seven required inserting a fixture "into ring with +/-.001 tolerance," [53-19] at 3) or brought with him from ABC documents that contained that information.

The first problem with this argument is that by waiting to raise it in their reply brief, ABC deprived AIP, Trauscht, and Koziel the opportunity to respond. The argument is waived. The second problem is that neither the Defend Trade Secrets Act or Illinois's Trade Secrets Act supports that theory. Under both statutes, misappropriation includes the acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means. 18 U.S.C. § 1839(5)(A); 765 Ill. Comp. Stat. Ann. 1065/2(b)(1). Koziel never told Trauscht that he had taken information from ABC, [95] ¶ 25, and Trauscht did not know that Koziel's employment agreement potentially prevented him from disclosing such information. *See supra*, n.4. Acquisition "implies more than passive reception; it

27

implies pointed conduct intended to secure dominion over the thing." *Silvaco Data Sys. v. Intel Corp.*, 184 Cal.App.4th 210, 223 (2010), *as modified on denial of reh'g* (May 27, 2010); *ATS Prod., Inc. v. Champion Fiberglass, Inc.*, No. C 13-02403 SI, 2013 WL 6086924, at *3 (N.D. Cal. Nov. 19, 2013); *In re Hernandez*, No. ADV 09-02271, 2011 WL 3300927, at *5 (B.A.P. 9th Cir. Jan. 5, 2011). Trauscht (and AIP) are not liable for misappropriation just because Trauscht read emails that Koziel sent them that might have contained trade secrets, or because they failed to fire Koziel (or take some other remedial measure). AIP and Trauscht's motion for summary judgment, [55], is granted insofar as that motion seeks judgment as a matter of law in AIP and Trauscht's favor on ABC's claim that Trauscht violated both the Defend Trade Secrets Act and Illinois's Trade Secrets Act. ABC's motion for summary judgment, [52], is denied insofar as that motion seeks summary judgment that Trauscht violated Illinois's Trade Secrets Act.

Neither ABC nor Koziel moved for summary judgment as to ABC's claim that Koziel violated the Defend Trade Secrets Act. *See* [52]; [53] (ABC moved for partial summary judgment as to Count II but not Count I); [67] (Koziel adopted AIP and Trauscht's positions as to the claim in Count VII that Trauscht and Koziel engaged in a civil conspiracy, but not any others). Each of the arguments AIP and Trauscht advance regarding ABC's Defend Trade Secrets Act claim is unique to Trauscht and AIP. *See, e.g.* [72] at 15–16. ABC's claim against Koziel for violations of the Defend Trade Secrets Act survives.

With regard to ABC's motion for summary judgment as to Count II against Koziel, Koziel points out that ABC has failed to identify with sufficient particularity the trade secrets underlying its claim. [78] at 9. Just as with its claim against Trauscht, ABC's motion for partial summary judgment never sufficiently identifies which information constitutes a trade secret. It says that Koziel misappropriated "massive amounts of confidential, proprietary and trade secret information," including but not limited to "customer identity and purchase history, manufacturing drawings, control plans, research and development materials, and customer lists." [53] at 7 (citing [1] ¶ 49). Elsewhere, ABC identifies "confidential pricing information, processes, customer buying history and needs, and drawings." [53] at 15. These are not concrete examples. *Composite Marine Propellers, Inc.*, 962 F.2d at 1266. They are too vague to allow a trier of fact to analyze whether any of the other elements of ABC's trade secret claim have been met.

At a few different points, ABC specifically focuses on the manufacturing drawings for Aetna part number A0046. Beidas says (in the complaint) that A0046 is a "specialty bearing with highly unique and specific tolerance requirements," that Aetna "designed and manufactured A0046 specifically for Dynex," and that the drawings are confidential and proprietary to Aetna. [53] at 9 (citing [1] ¶¶ 54–56). But nowhere does Beidas or ABC say that A0046 is a trade secret. Nor has ABC has cited evidence that A0046 was so secret that it derived "economic value, actual or potential, from not being generally known." 765 Ill. Comp. Stat. Ann. 1065/2(d)(1). Plus, even if one were to consider ABC's inadmissible damages evidence, ABC earned

29

as much or more money selling A0046 after the alleged misappropriation took place. [53-17] at 5. ABC has not properly cited to any evidence that will be sufficient to carry its burden of establishing damages for A0046 at trial.[9]

The remaining information that ABC discusses in its motion for partial summary judgment is either not identified as a trade secret (e.g., the AIP Spindle drawing, the Slinger drawing that was attached to the purchase order, and the related pricing information, all of which ABC describes as "confidential and proprietary," but not as trade secrets, *see* [53] at 10), or a drawing that was not misappropriated (AG5710, see above). *See* [53] at 10. ABC makes vague assertions about the defendants' joint involvement in a plot to remove Aetna's name from a series of drawings that were circulated to some of AIP's clients, *see* [53] at 10, but it never ties that plot to its theories about trade secrets misappropriation and, in the process, repeatedly omits page cites to exhibits that contain hundreds of text messages. *Id.* (citing [53-7]; [53-8]). I decline to pore through those texts and other materials in search of information that constitutes a trade secret or the exchanges

---

[9] There is at least one issue that appears subject to a genuine dispute: Beidas says A0046 was designed specifically for Dynex and that the drawings are confidential and proprietary, and one of Aetna's engineers says otherwise. [95] ¶ 19; [59-4] 35:21–36:1. That genuine issue is yet another reason to deny ABC's motion for summary judgment as to Count II against Koziel. It is no reason to deny AIP and Trauscht's motion for summary judgment as to either Count I or Count II because ABC has not properly cited to evidence that would support a reasonable inference that Trauscht misappropriated A0046. *See* [82] ¶¶ 70–71. Even if ABC had cited such evidence, the fact that ABC has failed to cite to evidence of A0046-related damages would be enough to grant Trauscht's motion for summary judgment with relation to that part. The only reason Koziel does not benefit from a similar conclusion is that he did not move for summary judgment on either Counts I or II.

that might somehow make Koziel responsible for the misappropriation of those secrets. *IDX Sys. Corp.*, 285 F.3d at 584.

In its opposition to AIP and Trauscht's motion for summary judgment, [81] ABC points out that Koziel accessed files related to Polaris following his departure from ABC. *See* [81] at 3. In their reply, AIP and Trauscht point out that Koziel never transferred or shared any Polaris-related information from his USB drive to AIP or Trauscht. [90] at 4; [82] ¶¶ 59–60.[10] But Koziel did not need to transfer those files in order to make use of them and, by that point, he had already acquired them. *See* 765 Ill. Comp. Stat. Ann. 1065/2(b). And with regard to the Polaris-related PowerPoint presentation, Excel file, the file, "Polaris DG 6205-TR48," and the efficiency graph, Beidas's and Koziel's testimony was conflicting, *compare* [53-4] at 231:19–232:19 *with* [80-1] ¶¶ 14–16, and a jury would have to decide which of them is telling the truth. Genuine disputes of material fact remain as to whether or not Koziel misappropriated information that qualified as a trade secret.

Given ABC's repeated failures to identify most of its trade secrets as such, the paucity of evidence it has produced tending to suggest that it suffered damages related to part number A0046, and its failure to cite to evidence showing that the information in question derived independent economic value from not being generally known—ABC will likely have trouble succeeding on both its federal and Illinois-law-

---

[10] Koziel adopted as his own only those arguments that AIP and Trauscht made in Section IV of their reply in support of the motion for summary judgment, [92], not the arguments they made about Koziel's access of Polaris's documents. *See* [90] at 4 (§ I.A). Nonetheless, I consider AIP and Trauscht's arguments here because, even though they are not necessary for determining whether Trauscht is liable for trade secret misappropriation (he is not), they remain pertinent to determining Koziel's liability for trade secret misappropriation.

based trade secret misappropriation claims against Koziel at trial. But those claims survive.

### C.    Count IV: Breach of Contract by Koziel

Koziel's employment agreement is governed by Illinois law. In order to prevail at trial on its breach-of-contract claim, ABC will have to prove that there was a valid and enforceable contract, that it substantially performed its end of the agreement, that Koziel breached the agreement, and that it was damaged as a result. *See Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019); *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill.2d 52, 75 (2006).

Koziel's employment agreement covered more than just trade secrets. It placed restrictions on his use of information that fell short of trade-secret status, so long as that information was disclosed through his relationship with ABC or Aetna, had value to ABC, and was not generally known to either ABC's or Aetna's competitors. [53-3] at 8 (§ 6.6). The non-disclosure portion of his agreement prohibited him from not only from divulging that information, communicating it, or using it to the detriment of ABC or for the benefit of any other person, firm, or corporation, but also from "misus[ing] it in any way." *Id.* at 7 (§ 6.3), 9 (§ 6.6).

Shortly before his last day at ABC, Koziel downloaded files off of his ABC computer onto a USB drive.[11] Koziel never transferred the files to another drive but

---

[11] Beidas says Koziel then deleted the files off the company laptop's trash folder, [1] ¶ 50, implying consciousness of guilt. But Beidas's testimony does not provide any context that suggests he has personal knowledge as to what Koziel did with his ABC computer. *See* [53-4] at 212:14–214:5; Fed. R. Civ. P. 56(c)(4); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). That testimony has been disregarded.

he did, on ten occasions, open them. [82] ¶ 59; [95] at 35, ¶¶ 17–18; [80-2] at 13–15. Just as he did not need to transfer those files to any other computer in order to misappropriate any trade secrets contained therein, he also did not need to transfer those files in order to divulge or communicate the information in them or to use that information to ABC's detriment (or AIP's benefit).

On three of the ten occasions that he accessed that information, he opened his resume. [95] at 35, ¶ 18. No one argues that Koziel's resume was confidential or proprietary to ABC or Aetna. On six of the seven remaining instances, he accessed information relating to one of Aetna's former customers, Polaris. [95] ¶ 19; [80-2] at 13–17. On the seventh, he accessed an Excel file which was either blank (according to Koziel, [80-1] ¶ 15) or which produced graphs that helped ABC monitor production (according to Beidas). [53-4] at 232:3–232:9. Just as there are genuine disputes about whether trade secret protections apply to the efficiency graph, Excel spreadsheet, PowerPoint presentation, and the file titled, "DG6205-TR48," *compare* [53-4] at 230:22–232:19 (Beidas says each is confidential and proprietary) *with* [80-1] ¶¶ 14–16 (Koziel says that none of them are), there are genuine disputes about whether those documents are confidential information under Koziel's agreement. *See* [53-3] at 8 (§ 6.6).

Of course, those disputes will not be worth much if ABC cannot prove Polaris-related damages. *Ins. Benefit Grp., Inc. v. Guarantee Tr. Life Ins. Co.*, 2017 IL App (1st) 162808, ¶ 48 ("[d]amages are an essential element of a breach of contract action and a claimant's failure to prove damages entitles the defendant to judgment as a

matter of law"); *Sevugan*, 931 F.3d at 614. ABC has cited no evidence suggesting it will be able to prove Polaris-related damages at trial. There is no evidence in the record of ABC's previous and current sales with Polaris (such that the latter might be subtracted from the former in order to infer damages), no suggestion that Koziel somehow used the Polaris-related documents to cause ABC to lose sales from customers other than Polaris, and no indication of how else ABC might prove Polaris-related damages at trial. An and Trauscht texted each other about having Koziel reach out to someone at Polaris, [53-8] at 3, but Koziel never made any sales, [82] ¶ 66, and ABC has not pointed to any evidence or articulated any theory that An or Trauscht used what Koziel told them about Polaris to successfully solicit Polaris's business, either.[12] And whether a breach was material (another element of ABC's claim) turns in part on whether disproportionate harm was visited upon the non-breaching party. *Sahadi v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 706 F.2d 193, 196 (7th Cir. 1983). Without evidence of damages, ABC may have trouble proving disproportionate harm at trial. *See also Prima Tek II, L.L.C. v. Klerk's Plastic Indus.*,

---

[12] ABC says that Koziel's breaches also caused it "lost reputation with its customers," [53] at 14, but the only evidence that ABC cites in its motion that contained allegedly disparaging or defamatory content (which is also the only evidence ABC put forth that might ostensibly prove that lost reputation) were sent by Trauscht, not Koziel. *See* [53] at 11–12 (citing [53-13]; [53-15]; [53-16]). ABC has not brought a claim against Trauscht for breach of any employment agreement. ABC also produced evidence that it sold $20,000 less of part number A0046 after Koziel left. [53-17] at 5. Koziel had communications with both Dynex, [77] ¶¶ 26–27; [53-11] at 2, and Dover, *see* [53-18], about that part after leaving ABC. But unlike the other discovery responses cited in support of the parties' briefing, ABC's response to AIP's third set of interrogatories was not signed by anyone under penalty of perjury. *See* [53-17] at 8. The evidence of ABC's A0046-related losses would be inadmissible at trial and cannot be submitted in support of ABC's motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(4).

*B.V.*, 525 F.3d 533, 538 (7th Cir. 2008) (A party can only be held liable for damages resulting from a material breach). But all that needs to be said for now is that ABC is not entitled to summary judgment in its favor.

With regard to Aetna's pricing, Koziel says he had no knowledge of it, [53-9] 46:22–24, but his emails support a contrary inference. *See* [53-19] at 2 ("Aetna quoted the whole eau of 6000. Price 13.92 or so"); [53-8] at 7 (Trauscht told An over text that someone named "Don" had told him about the price Aetna charged for another item). Genuine disputes of material fact remain. ABC's motion for summary judgment on Count IV, [53] at 13–14, is denied. AIP, Trauscht, and Koziel all elected to forgo a motion for summary judgment in Koziel's favor on Count IV, *see* [67]; [72], so ABC's claim against him for breach of his employment agreement survives.

### D. Count V: Breach of the Duty of Loyalty Against Trauscht and Koziel

In order prevail on a claim for breach of fiduciary duties under Illinois law, a plaintiff has to prove that "(1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) the breach proximately caused the injury of which the plaintiff complains." *Ball v. Kotter*, 723 F.3d 813, 826 (7th Cir. 2013). Corporate officers (such as Trauscht, a former president of Aetna, [91] ¶ 1) owe fiduciary duties to their corporations, *Brown v. Tenney*, 125 Ill.2d 348, 360 (1988), among them the duty of loyalty. *Everen Sec., Inc. v. A.G. Edwards & Sons, Inc.*, 308 Ill.App.3d 268, 276 (1999). The duty of loyalty prohibits those officers from either "actively exploit[ing] their positions within the corporation for their own personal benefit" or "hinder[ing] the ability of a corporation to continue the business for which it was developed."

*Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003) (citing *Cooper Linse Hallman Capital Mgmt., Inc. v. Hallman*, 368 Ill.App.3d 353, 357 (1st Dist. 2006)). The "nature and intensity" of the duty depends in part on how much independent authority the fiduciary exercised and the parties' reasonable expectations at the beginning of the relationship. *Advantage Mktg. Grp., Inc. v. Keane*, 2019 IL App (1st) 181126, ¶ 27.

Examples of breaches of this duty include failing to inform the company that employees are forming a rival company, soliciting the business of a customer before leaving the company, using the company's facilities or equipment to assist them in developing their new business, or soliciting fellow employees to join a rival business. *Foodcomm Int'l*, 328 F.3d at 303. In addition, corporate officers must disavow corporate opportunities where the officer's private interests are in conflict with the corporation's. *Comedy Cottage, Inc. v. Berk*, 145 Ill.App.3d 355, 359 (1st Dist. 1986). Fiduciaries may enter into competition with their former employers once their employment is complete, so long as the transaction in question did not begin during the existence of their previous fiduciary relationship and was not founded on information acquired during that relationship. *Id*.

Employees (like Koziel) owe their employers a fiduciary duty, too. *Lawlor v. N. Am. Corp. of Illinois,* 2012 IL 112530, ¶ 69. That duty prohibits employees from soliciting an employer's customers for their own business, misappropriating corporate property, taking advantage of corporate business opportunities, or using confidential information to compete with an employer before or after their employment.

36

*Advantage Mktg. Grp., Inc. v. Keane*, 2019 IL App (1st) 181126, ¶ 23; *Cooper Linse Hallman Cap. Mgmt., Inc. v. Hallman*, 368 Ill.App.3d 353, 357–58 (1st Dist. 2006). Employees are allowed to "plan, form, and outfit a competing corporation" before leaving their employer so long as they do not "commence competition." *Advantage Mktg. Grp., Inc. v. Keane,* 2019 IL App (1st) 181126, ¶ 25.

The Trade Secrets Act does not preempt ABC's theory here. The act was intended to displace all of Illinois's "conflicting tort, restitutionary, unfair competition, and other laws," insofar as those laws already provided civil remedies for misappropriation of a trade secret. 765 Ill. Comp. Stat. Ann. 1065/8. *See also Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014) (claims for quantum meirut and unjust enrichment are essentially claims for restitution). Trauscht's and Koziel's fiduciary duties prohibited certain courses of conduct (for instance, soliciting the business of a customer before finishing employment) that went beyond simple trade secret misappropriation. *See Hecny Transp., Inc.*, 430 F.3d at 405; *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F.Supp.3d 815, 834 (N.D. Ill. 2019) ("Where a claim would survive regardless of whether the information at issue was non-confidential … that claim is not preempted."). ABC's claim for breach of the duty of loyalty is not preempted just because some portion of what Trauscht and Koziel did might have amounted to trade secret misappropriation. *See Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404–05 (7th Cir. 2005) ("An assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record").

Whether former officers owe fiduciary duties to successor corporations appears to be an issue of first impression in Illinois. Federal courts must predict how the state supreme court would decide the issue. *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). In Illinois, fiduciary duties are "founded on the substantive principles of agency, contract *and* equity." *Armstrong v. Guigler*, 174 Ill.2d 281, 294 (1996) (emphasis in original); *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1337 (7th Cir. 1992) (breach of a fiduciary duty is not an action "on written contract[s]"). A fiduciary duty is "extracontractual," and can arise "even in the absence of a contract," *Armstrong*, 174 Ill.2d at 295, so the fact that Trauscht never signed an employment agreement with ABC (his was with one of ABC's predecessors, [83-1] at 2) is not determinative.

The Illinois Supreme Court would look to agency law, contract law, and principles of equity to determine whether a former employee of one company owes fiduciary duties to a successor corporation that purchased the former company's assets. Under contract principles, merely transferring assets from one corporation to the other does not usually make the latter liable for the debts and liabilities of the former. *Hoppa v. Schermerhorn & Co.*, 259 Ill.App.3d 61, 64 (1st Dist. 1994); *Nilsson v. Cont'l Mach. Mfg. Co.*, 251 Ill.App.3d 415, 418–19 (2nd Dist. 1993); *Buis v. Peabody Coal Co.*, 190 N.E.2d 507, 510 (3rd Dist. 1963). There are, however, exceptions to this rule, including where (1) there was an express or implied agreement that the successor corporation would assume that liability, (2) the transaction amounts to a merger of the seller into the buyer or a consolidation of the two companies (often in

38

the form of a de facto merger), or (3) the buyer is a mere continuation of the seller. *Hoppa*, 259 Ill.App.3d at 64; *Nilsson,* 251 Ill.App.3d at 418.

Neither side has pointed to any agreement wherein ABC expressly agreed to assume Aetna's liabilities.[13] Under the asset purchase agreement, ABC expressly declined to assume liability as a successor to any claim brought by or against Aetna, [53-2] at 8 (§ 2.4), but what matters for purposes of Trauscht's fiduciary duties would be whether Trauscht agreed to continue abiding by his fiduciary duty to Aetna after Aetna was purchased by ABC, and neither side has pointed to such an explicit agreement.

A de facto merger occurs where there has been a "combining of two existing corporations into a single successor corporation." *Nilsson,* 251 Ill.App.3d at 418. A mere continuation occurs where a corporate reorganization takes place, such that the

---

[13] AIP and Trauscht attached two exhibits in support of their reply that were not attached to their motion. [90-1]; [90-2]. The first is a copy of what purports to be a "plan of dissolution" for "ABC Disposition Company (formerly known as Aetna Bearing Company)." [90-1] at 1. The second is a copy of a motion to dismiss that "Aetna Bearing Company" filed in a state court action wherein Trauscht was the plaintiff. [90-2] at 2. According to AIP and Trauscht's characterizations of those exhibits, Aetna waived and released any claims it had against Trauscht (including, presumably, any claim that Trauscht breached his fiduciary duties). *See* [90] at 8–9. ABC had no opportunity to address those exhibits in their briefing, so those exhibits are disregarded. *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 968 (7th Cir. 2020) ("District courts abuse their discretion when they deny a party a chance to respond to new arguments or facts raised for the first time in a reply brief in support of a motion for summary judgment and subsequently enter judgment on the basis of those new arguments or facts"). I also decline to take judicial notice of Aetna's plan of dissolution. [90] at 8 n.3. Although it is beyond reasonable dispute that Aetna attached the plan of dissolution to a motion to dismiss in response to Trasucht's complaint against it in state court, *see* [90-2] at 2, 8–19, AIP and Trausht's argument depends not on the fact that the plan of dissolution was so attached, but on the contents of the plan itself, *see* [90] at 8–9, and the contents of the plan are not beyond reasonable dispute. Fed. R. Evid. 201(b). One reasonable dispute could be over whether the plan of dissolution that was attached to the motion to dismiss was the operative version.

new corporation has "simply 'put on a new coat.'" *Id.* (quoting *Kraft v. Garfield Park Cmty. Hosp.*, 296 Ill.App. 613, 619 (1st Dist. 1938)). Continuity of stock ownership is critical under both theories. *Id.*

ABC has cited no evidence that ABC's purchase of Aetna's assets amounted to either a de facto merger or a mere continuation. *See* [81] at 13–14. ABC bought Aetna's assets in cash. [53-2] at 10 (§ 2.5(B)). There was no stock transfer. Although neither side cited evidence showing how many of Aetna's employees actually stayed on at ABC, the asset purchase agreement only required that ABC enter into employment agreements with three of them (among them Koziel). [53-2] at 30 (§ 6.1(c)); [53-2] at 32 (§7.1); [53-2] at 5 (§ 1.1) ("'Key employees' means Don Koziel, Joe Galvin, and Cindy Jenkins"). At least by the time Beidas took over, ABC had twenty-seven employees (seventeen of whom worked on the shop floor). [91] at 9, ¶ 15; [53-4] 28. Three out of twenty-seven is not enough to justify a finding that there was a continuation of the enterprise, either. *See Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 812 F.Supp. 124, 129 (N.D. Ill. 1993) (no finding of de facto merger where only six of thirty-seven employees went to work for the purchasing entity after the asset purchase). If the Supreme Court of Illinois were to entertain the theory that Trauscht owed a fiduciary duty to ABC, it would look to contract principles and decide that ABC was not the successor to Aetna in any way the entitled it to enforce Trauscht's fiduciary duties.[14]

---

[14] AIP and Trauscht say that ABC's de facto merger theory is new, and that they had no chance to conduct discovery into whether or not it occurred. The complaint alleges that ABC's theory was that Trauscht breached the duty of loyalty while employed at Aetna. [1] ¶ 91. AIP and Trauscht have known all along that the plaintiff in this lawsuit was ABC, not Aetna, and

Even if ABC could sue to enforce the fiduciary duties that Trauscht owed to Aetna, ABC's theory as to how Trauscht breached them is speculative and has no evidentiary support. Again, by the time Trauscht started at Aetna, thousands of Aetna's drawings were already in circulation with its many suppliers. [59-2] 34:21–35:1. In its opposition to AIP's motion for summary judgment, ABC clarifies that part of its theory is that Trauscht breached his fiduciary duties when he sent An certain manufacturing drawings (or at least, when he sent An those drawings and failed to implement an NDA). [81] at 13. But the only reasonable inferences to draw from Trauscht's decision to circulate the drawings are either (1) that An needed those drawings in order to manufacture the parts Aetna wanted to buy (and that Trauscht made the good-faith business decision to disclose those drawings, despite their potentially confidential or proprietary status, so that An could complete the job) or (2) that those drawings (or ones like them) had already been so widely distributed to Aetna's suppliers that there was no longer any claim that they were confidential or proprietary to begin with. There is no basis to infer that Trauscht, years before starting AIP, decided to disseminate confidential and proprietary information to An and other suppliers so that, years later, Trauscht could start AIP and obtain those drawings from An without running afoul of his contractual and fiduciary obligations to his former employer.

---

had notice that one way to defend against ABC's claims would have been to prove that the former was not the latter for purposes of the duty of loyalty. ABC's de facto merger theory is not barred just because it was raised late.

ABC also says that Trauscht breached his fiduciary duties when he used information that he obtained at Aetna to solicit former clients after departing Aetna. But there, too, ABC explicitly limits its theory to the speculative accusation that Trauscht intentionally timed his ill-meaning efforts to avoid the restrictions in his own employment agreement. Again, there is no evidence to support such a far-sighted scheme on Trauscht's part.

To the degree ABC's argument can be understood to posit that Trauscht breached his fiduciary duties after leaving Aetna by accepting information from Koziel, that claim fails because Trauscht was by that point free to compete with ABC so long as that competition did not begin while he was employed at Aetna and so long as it was not founded on information he obtained while there. *Comedy Cottage, Inc. v. Berk*, 145 Ill.App.3d 355, 359 (1st Dist. 1986). (And since Trauscht did not solicit Koziel to join AIP while Trauscht was working at ABC, he would not be liable under that theory, either, even if the Supreme Court of Illinois were to rule that he owed fiduciary duties to ABC in the same way he owed them to Aetna. *See Unichem Corp. v. Gurtler,* 148 Ill.App.3d 284, 290 (1986).)

AIP and Trausht's motion for summary judgment, [55], is granted insofar as that motion seeks judgment as a matter of law on ABC's claim that Trauscht breached his fiduciary duties.[15] Koziel did not file a motion for summary judgment as to Count V. ABC's claim against Koziel for breach of his fiduciary duty survives.

---

[15] AIP and Trauscht's argument in their reply, [90] at 8, that ABC's claim against Trauscht is time-barred has been disregarded. *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.

### E. Count VI: Tortious Interference with Contractual Relations Against AIP and Trauscht

In order to prevail at trial on an interference-with-a-business-expectancy claim, ABC would have to prove that it had a reasonable expectation of entering into a valid business relationship, that AIP and Trauscht knew about that expectancy, that AIP and Trauscht purposefully interfered to prevent the expectancy from being fulfilled, and that ABC suffered damages as a result. *Cook v. Winfrey,* 141 F.3d 322, 327 (7th Cir. 1998). In order to prevail at trial on an interference-with-contractual-relations claim, ABC has to prove "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages." *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 454 (7th Cir. 2012) (quoting *Complete Conference Coordinators, Inc. v. Kumon N. Am., Inc.*, 394 Ill.App.3d 105, 109 (2009)); *Cook*, 141 F.3d at 327.

The complaint explicitly alleges that Trauscht and AIP tortiously interfered with one contract in particular: Koziel's confidentiality agreement. [1] ¶ 97 ("AIP and Trauscht intentionally and unjustifiably induced Koziel to breach his confidentiality agreement with the promise of future employment with AIP"). Elsewhere, in the section of the complaint alleging that Trauscht misappropriated ABC's trade secrets, ABC alleges that Trauscht was planning his defection to AIP while still working with

---

1989) ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not").

Aetna, was preparing for that defection by uploading confidential, proprietary, and trade secret information, and that he then later used that information to solicit Aetna's customers. [1] ¶¶ 35–37.

ABC's summary judgment motion does not address its claim for tortious interference with Koziel's confidentiality agreement and instead addresses only the theory that Trauscht and AIP committed tortious interference with a business expectancy (which ABC, for the first time, argues occurred when Trauscht and AIP stole customers with whom it says ABC had a reasonable expectation of continued business, such as Shoup and Calmer). [53] at 14. ABC says that AIP and Trauscht had fair notice of this theory because of the three paragraphs in the section of the complaint about Trauscht's alleged trade secret misappropriation. [93] at 4 n.1.

ABC was under no obligation to spell out all of its legal theories in its complaint. *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1023 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 1465 (2019). All it had to do was set forth plausible facts that, if true, would support a claim for relief—so long as, in doing so, it gave "fair notice of what this suit was about." *Id*. But at the summary judgment stage, ABC cannot alter the fundamental factual basis for the claims alleged in the complaint, *id*., and can only alter its legal theories so long as doing so would not cause unreasonable delay or make it more costly or difficult to defend the suit. *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 540 (7th Cir. 2018); *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017).

44

ABC's complaint is not silent about its theory that Trauscht harmed ABC by using confidential and proprietary information to solicit ABC's customers. Changing its legal theory at the summary judgment stage to one of tortious interference with a business expectancy does not alter the fundamental factual allegations within ABC's complaint. But ABC's failure to label this claim, while expressly claiming that it was suing over tortious interference with Koziel's contract, has unfairly prejudiced AIP and Trauscht. By floating one theory for tortious interference that focused on Koziel's employment agreement and then switching it for a theory of tortious interference that focuses on ABC's existing business relationships with its customers, ABC visited unfair surprise on AIP and Trauscht. At this point in the proceedings, AIP and Trauscht are stuck with the discovery obtained to defend against a different claim than the one ABC now says it's pursuing. ABC, on the other hand, has sole access to many of the facts it needs to prevail on that claim (e.g., evidence going to why ABC might have expected its business relationships with Calmer, Shoup, and others, to continue) and finds itself at an advantage due to nothing other than what appears to have been its own carelessness (or worse, gamesmanship). Reopening discovery this late in the game so that AIP and Trauscht could gather the information they need to defend against this claim would require both parties to expend significant resources in order to double-back on depositions, discovery requests, and other efforts, at significant prejudice to AIP and Trauscht. That prejudice was not due.

In any event, again, any theory of ABC's that is based on the allegation that Trauscht planned his departure from Aetna with the intention of later interfering

45

with Aetna's customers via information he took with him from Aetna is unsupported by any evidence. It is speculation and ABC must come forward with evidence beyond its complaint allegations. ABC's motion for summary judgment on Count VI is denied, and ABC is barred from pursuing a claim based on its customer-business expectancy because of unfair delay and prejudice.

ABC has abandoned the claim in its complaint that AIP and Trauscht interfered with the Koziel contract. But that claim fails anyway because ABC has not properly cited any evidence that Trauscht was aware of Koziel's employment agreement at the time that he hired him, or that Trauscht accepted receipt of what might potentially have been confidential or proprietary information.[16] Trauscht's momentary hesitation regarding whether he had seen the agreement before his deposition does not create a genuine dispute. *See supra* n.4. Trauscht consistently testified that he had never seen Koziel's employment agreement before he hired Koziel and that, to the degree he was aware of it, he was told by Koziel that the agreement had expired and was not renewed. [59-2] 88:13–20. Nor has ABC produced any evidence that Trauscht should have known about Koziel's employment

---

[16] As discussed above, Illinois's Trade Secrets Act preempts conflicting civil remedies. 765 Illinois Comp. Stat. 1065/8(a). The claim pled in ABC's complaint—which is that Trauscht and AIP interfered with ABC and Koziel's confidentiality agreement by inducing Koziel to breach it—is based in part on the misuse of information that may have been a trade secret. [1] ¶ 8 ("AIP and Trauscht's conduct caused Koziel to breach the confidentiality agreement by providing confidential, proprietary, and trade secret information to AIP and Trauscht"). But that does not make it a conflicting tort claim. *IDX Sys. Corp. v. Epic Sys. Corp.,* 285 F.3d 581, 586–87 (7th Cir. 2002) ("The tort of inducing breach of a non-disclosure contract (the sort of contract independently protected by [765 Illinois Comp. Stat. 1065/8(b)(1)]) is 'not based upon misappropriation of a trade secret.' It is based on interference with the contract.") ABC's claim for tortious interference with Koziel's employment agreement is not preempted.

agreement by virtue of the fact that he was a partial shareholder when ABC bought Aetna's assets. *See* [82] ¶¶ 61–63. At most, ABC has properly cited to facts from which a reasonable jury could infer that Trauscht was negligent about the existence of Koziel's agreement. But negligent interference is not a cause of action. *Santucci Const. Co. v. Baxter & Woodman, Inc.*, 151 Ill.App.3d 547, 552 (2nd Dist. 1986). *See also* Restatement (Second) of Torts § 766C (1979) ("One is not liable to another for pecuniary harm not deriving from physical harm to the other, if that harm results from the actor's negligently (a) causing a third person not to perform a contract with the other, or … (c) interfering with the other's acquiring a contractual relation with a third person.") AIP and Trauscht's motion for summary judgment, [55], is granted insofar as that motion seeks judgment on ABC's theories that Trauscht (and, via Trauscht, AIP) tortiously interfered with either ABC's business expectancy or ABC's contractual relationship with Koziel.

### F.    Count VII: Civil Conspiracy

Civil conspiracy is not an independent cause of action under Illinois law. *Horist v. Sudler & Co.*, 941 F.3d 274, 281 (7th Cir. 2019); *Thomas v. Fuerst*, 345 Ill.App.3d 929, 936 (1st Dist. 2004). If there is no independent action that the defendants conspired to commit, there is no conspiracy, either. *Id.* In addition, in order to prevail at trial on its civil conspiracy claim, ABC will have to prove the existence of an agreement for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means and at least one tortious act by one of the co-conspirators

in furtherance of that agreement that caused ABC's injury. *Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 930 (7th Cir. 2017).

There has to be an agreement and a tortious act for there to be a conspiracy. *Id. See also McClure v. Owens Corning Fiberglas Corp.,* 188 Ill.2d 102, 133 (1999). Mere knowledge of the fraudulent or illegal action is not enough. *Id*. at 133–34. Conspiracies are often difficult to prove by direct proof and are usually established "from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 134 (1999). If circumstantial evidence is used, that evidence must be clear and convincing. *Id.*

"There can be no civil conspiracy between a corporation and its agents." *Small v. Sussman*, 306 Ill.App.3d 639, 647 (1st Dist. 1999). That precludes any theory that Koziel was conspiring with AIP after he was hired there. That same rule applies to preclude theories of a civil conspiracy between "a corporation's own officers or employees." *Van Winkle v. Owens-Corning Fiberglas Corp.*, 291 Ill.App.3d 165, 173 (4th Dist. 1997) ("a civil conspiracy cannot exist between a corporation's own officers or employees"); *Milliman v. McHenry Cty.,* No. 11 C 50361, 2012 WL 5200092, at *4 (N.D. Ill. Oct. 22, 2012). Neither of the two exceptions to the latter rule (one of which is when the conspirators act out of self-interest rather than in the interest of the principal corporation, and the other of which is when the conspirators act beyond the scope of their official duties) applies here. That knocks out the theory that Koziel conspired with Trauscht after arriving at AIP.

48

All that is left is the theory that Trauscht and Koziel conspired before Koziel's departure from ABC, at a time when Koziel was not an employee of AIP. *See* [81] at 15–16 (ABC says that Trauscht was the primary wrongdoer and that Koziel conspired with him to bring ABC's trade secrets to AIP). Koziel had a meeting with Trauscht wherein Trauscht invited him to apply to AIP in the event that his employment with ABC ever came to an end. [82] ¶¶ 55–57; [77] ¶¶ 20–21; [95] ¶ 24. Koziel later downloaded documents from an ABC computer, left ABC for AIP, and (in the process) potentially either misappropriated trade secrets or breached his employment agreement or fiduciary duties. But ABC has produced no evidence that Trauscht knew that what Koziel planned to do was improper. Again, Trauscht did not know about Koziel's employment agreement and was not aware of facts from which he should have inferred the existence of an employment agreement that might have been violated when Koziel came to AIP. *See* [82] ¶ 53; [59-2] 89:8–90:24. *See also supra*, n.4. Even if he had been aware of that agreement, mere knowledge of the fraudulent or illegal action would not be enough. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 133 (1999). ABC would have had to have come forward with evidence showing that Trauscht and Koziel agreed to violate Koziel's employment agreement, misappropriate trade secrets, breach Koziel's fiduciary duties, or take some similarly wrongful action. It has failed to properly cite to any such evidence. AIP and Trauscht's, [55], and Koziel's, [67], motion for summary judgment is granted insofar as that motion seeks judgment in their favor on ABC's theories that Trauscht and Koziel engaged in a civil conspiracy.

## IV.    Conclusion

ABC's motion for partial summary judgment, [52], is denied. AIP and Trauscht's motion to strike, [73], is granted in part, denied in part, and its motion for summary judgment, [55], is granted with respect to all claims against AIP and Trauscht. Koziel's motion for summary judgment with respect to the civil conspiracy claim, [67], is granted. Any statement justifying the seal of documents [60]–[67] must be filed by September 1, 2020. A telephone status hearing is set for September 10, 2020 at 9:30 a.m. The clerk shall terminate defendants AIP and Trauscht as parties to the case, and ABC and Koziel should attempt to exhaust settlement discussions before the status hearing.


ENTER:

Manish S. Shah
United States District Judge

Date:  August 11, 2020